# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN LOSER, | : | 1:17-cv-712 |
| | : | |
| Plaintiff, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| DOLGENCORP, LLC, | : | |
| | : | |
| Defendant. | : | |

## **MEMORANDUM**

## **April 18, 2018**

Presently pending before the Court is a motion for summary judgment (the "Motion") filed by Defendant Dolgencorp, LLC, ("Defendant") on February 22, 2018. (Doc. 20). Plaintiff John Loser ("Plaintiff") filed a brief in opposition on March 30, 2018. (Doc. 25). Defendant filed a reply on April 13, 2018. (Doc. 27). The Motion is therefore ripe for our review and, for the reasons that follow, shall be granted.

**I.   BACKGROUND**

Plaintiff was employed by the Defendant as a Warehouse Supervisor at its Distribution Center in Bethel, Pennsylvania from June 24, 2013 to December 20, 2015. (Doc. 22, ¶ 1). Beginning in November 2014, Plaintiff supervised the Cycling Department at the Distribution Center. (*Id.* at ¶ 2). Plaintiff reported to the Inbound/Outbound Manager, Lovell Butler, who reported to the Operations

1

Manager, Keith Nicholson, who reported to the Distribution Center Director, Steve Kujovsky. (Doc. 20, att. 2, pp. 55, 57, 58) (Doc. 20, att. 3, pp. 9, 17).

As a Warehouse Supervisor, one of Plaintiff's responsibilities was to track the attendance of hourly employees who reported to him. (Doc. 22, ¶ 3). Plaintiff was expected to review his subordinates' time records in the electronic timekeeping system, Kronos, and identify employees who were tardy. (*Id*. at ¶ 5). If an hourly employee is more than thirty minutes late, the Warehouse Supervisor is responsible for charging unpaid time off from the employee's bank. (*Id*. at ¶ 6).

In early December 2015, Warehouse Supervisor Chad Livering reported to Nicholson his belief that Plaintiff was not enforcing the attendance policy in the Cycling Department; when Livering had supervised the Cycling Department in Plaintiff's absence, he noted that an employee had not been marked tardy on several prior occasions when the employee had been late to work. (*Id*. at ¶¶ 7-8). Nicholson then investigated by reviewing the time records in Kronos for all employees in the Cycling Department for approximately the past sixty days. (*Id*. at ¶ 9). After review, Nicholson believed there were several instances where employees clocked in after the start of the shift, but Plaintiff had not marked them as tardy. (*Id*. at ¶ 10). Nicholson reviewed the Kronos records for the time period between September 6 and November 27, 2015 and determined that several of Plaintiff's employees who would not have been eligible to receive an attendance

bonus were receiving such bonus anyway because Plaintiff had not marked them as late. (Doc. 20, att. 4, ¶ 16). After review, Nicholson also believed that there were three employees who should have been terminated due to excessive tardiness, but Plaintiff had not held them accountable. (*Id*. at ¶ 19) (Doc. 20, att. 3, p. 30).

Nicholson and Butler met with Plaintiff on December 7, 2015 to discuss Nicholson's belief that Plaintiff had not been enforcing the attendance policy. (Doc. 22, ¶ 12). During this meeting, Plaintiff explained that he was observing a seven-minute grace period for tardy employees under his supervision. (*Id*. at ¶ 12). Nicholson and Butler both clarified for Plaintiff that there was no such grace period allowed and that he was expected to mark an employee late even if the employee had clocked in only one minute after the start of their shift. (*Id*. at ¶ 13). Plaintiff expressed his understanding of these expectations and agreed to enforce the attendance policy going forward. (*Id*. at ¶ 14).

Following the December 7, 2015 meeting, Nicholson performed random audits of other employees' time records in Kronos to determine whether other Warehouse Supervisors were holding employees accountable for tardiness. (Doc. 20, att. 3, pp. 52-54). Nicholson testified that he does not recall finding any other tardiness issues with other Warehouse Supervisors' employees. (*Id*. at p. 54). Nicholson also testified that after the December 7, 2015 meeting, he asked various other managers and supervisors in the building if they had any knowledge of the

seven-minute grace period that Plaintiff had referred to. (*Id*. at pp. 73-74). The "consistent response" was that there was no seven-minute grace period. (*Id*. at pp. 74, 34-37). Nicholson further found several instances where Plaintiff had not marked an employee tardy or applied unpaid time off when they were more than thirty minutes late to work, undermining Plaintiff's assertion that his issue with employee oversight was due to his false belief in a seven-minute grace period. (*Id*. at pp. 50-54, 75-76).

Nicholson pulled a report from Kronos on December 16, 2015 which revealed that Plaintiff did not mark one of his employees, Kristin Rhoads, as tardy on December 7, 8, 10, and 15, despite her being late for work and despite Plaintiff's meeting with Butler and Nicholson. (*Id*. at p. 80). On December 7, 2015, Rhoads was an hour and a half late to work, but Plaintiff did not mark her as tardy. (*Id*.). Plaintiff testified that he recalled Rhoads being late on only one occasion after the December 7, 2015 meeting and that he had indeed marked her late, but he also testified that he has no reason to dispute the records from Kronos. (Doc. 20, att. 2, p. 101).

On December 16, 2015, Nicholson sent an email to Brad Wallace, the senior human resources manager. (Doc. 20, att. 3, Exhibits, p. 49) (Doc. 20, att. 3, p. 47). In the email, Nicholson explains that he and Lovell had sat down with Plaintiff to explain the tardiness issues, but that Plaintiff has continued to allow Rhoads to

clock in late without marking her as tardy. (Doc. 20, att. 3, Exhibits, p. 49). In the email, Nicholson states, "[t]his false recording of tardiness could pollute the credibility of our perfect attendance program as folks will get paid that shouldn't the bonus [sic]. Also, this is an integrity issue as he stated the '7 minute ignorance' claim and we audited and found that he infact [sic] was not logging tardiness beyond 7 minutes." (*Id*.). The next day, Nicholson sent another email to Wallace, copying Kujovsky. (Doc. 20, att. 3, Exhibits ,p. 47). Therein, Nicholson indicates that the cost audit for Plaintiff's failure to record tardiness or to dock unpaid time off was $1,280, and that three employees should have been terminated for tardiness if they had been properly marked as late. (*Id*.). Kujovsky forwarded the email to Steve McCormick, the vice president in charge of the Distribution Center at the time. (*Id*.) (Doc. 20, att. 3, p. 81).

The next day, on December 18, 2015, Kujovsky emailed McCormick again stating, "[a]fter conversation between Brad and Mark,[1] recommendation is

---

[1] Neither party has directly explained who Mark is, but our review of the records show that Mark Coe was copied on emails and participated in the discussion of Plaintiff's issues with tardiness. Nicholson testified in his deposition that Mark Coe was the director for supply chain human resources. (Doc. 20, att. 3, p. 60). Wallace had emailed Coe to discuss Plaintiff's issues on December 16, 2015, particularly detailing the issues with Plaintiff not marking Rhoads as tardy. (Doc. 25, att. 5, p. 1). Wallace responded, "I assume that she has NOT been receiving a pa bonus?" (*Id*.). Wallace confirmed that Rhoads had been receiving that bonus due to Plaintiff's failure to flag her as tardy, to which Coe responded, "[f]alsify documents. We need to see if this is wide spread or just him. Also need to check other employees that reports [sic] to him. We also need to see what the penalty should be." (*Id*.).

5

termination, integrity issue. I support. We just tried to call you to get your approval." (Doc. 20, att. 3, Exhibits, p. 46). McCormick responded:

> There is more to his record than this incident, correct? Let's make sure there are no other supervisors not enforcing the tardiness policy. If we have not overlooked consistent deviations by other supervisors I am good with the decision. I am also good if this is the final straw on a larger performance picture. The combination is compelling even if we didn't have him on a "final".

(Doc. 20, att. 3, Exhibits, p. 45). Kujovsky forwarded McCormick's response to Nicholson. (*Id.*). Nicholson responded:

> Brad spot checked 5 other individuals that were granted the attendance bonus and none of which had false reporting.
>
> The bigger issue here is the integrity: he directly lied about the instances regarding Kristen [Rhoads] and Anibal; he then continued to violate the policy after being made aware by Lovell and I.
>
> We will conduct full auditing tonight/tomorrow on other sups but the spot checking that I have done as of now has yielded no additional violators than John Loser.

(*Id.*). On December 20, 2015, Nicholson met with Plaintiff and terminated his employment. (Doc. 20, att. 3, p. 23). Nathan Elliot, a senior manager for warehouse management systems, sat in on the meeting as a witness. (*Id.* at pp. 23-24). Nicholson testified that he made the decision to terminate Plaintiff and that his reason was "[f]ailure to enforce policies and inaccurately recording records on timekeeping and employee attendance." (*Id.* at pp. 16-17). At the meeting, Nicholson presented Plaintiff with a personnel action form that indicated he was

being terminated for falsifying records. (*Id*. at p. 18) (*Id*. at Exhibits, p. 38). Nicholson signed the form, but Plaintiff refused to do so because he did not agree with the reason for termination. (*Id*. at pp. 23-25).

Plaintiff is a Type I diabetic. (Doc. 20, att. 2, p. 23). At some point during his employment, Plaintiff had to take an ambulance to the hospital for a particularly severe hypoglycemic episode. (*Id*. at pp. 111-113). Additionally, Plaintiff took a leave of absence from June 10, 2014 until August 13, 2014 due to an injury on his foot. (*Id*. at 113-115). Plaintiff testified that at some point soon after his return from absence in 2014, Kujovsky and Plaintiff discussed a situation involving the promotion of another supervisor to a management position. (*Id*. at p. 120). Plaintiff indicated that he did not agree with the promotion, and Kujovski said, "[h]ey, don't forget about what we did for you when you were sick, or something along those lines." (*Id*.). Plaintiff believed that Kujovski was referring to his belief that he did Plaintiff a favor because of his disability, and took the comment to indicate that Kujovski did him a favor and he should watch what he was doing. (*Id*. at p. 121).

Plaintiff further testified that he felt like he was neglected due to his diabetes. (*Id*. at p. 122). He recalled an instance where his direct supervisor at the time, John Gleisner, came up to him and asked if he was okay because he did not look right; Plaintiff did not respond because he was going into a hypoglycemic

7

episode, and Gleisner did nothing and left the building. (*Id*. at pp. 122-123). He testified that he could not recall any other instances where he felt he was treated in a derogatory manner due to his diabetes, and specifically could not recall any instance where Nicholson said anything derogatory about his diabetes. (*Id*. at p. 125).

Plaintiff initiated this action by filing a three-count complaint on April 21, 2017. (Doc. 1). Count I alleges that Defendant terminated him on the basis of his disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq*. Count II alleges that Defendant terminated him as retaliation for taking a leave of absence, in violation of the Family and Medical Leave Act of 1993 ("FMLA"), U.S.C. § 2601, *et. seq*. In Count III, Plaintiff alleges Defendant terminated him on the basis of his disability, in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 952, *et. seq*.

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162,

8

172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial. *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

9

properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

### III. DISCUSSION

Plaintiff brings two counts of disability discrimination in Counts I and II, alleging that Defendant terminated his employment because of his diabetes in violation of the ADA and the PHRA. We note that "[t]he analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds." *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 142 (3d Cir. 2011). Our discussion of Plaintiff's ADA claim, therefore, applies with equal vigor to his claim pursuant to the PHRA. In Count II, Plaintiff alleges that Defendant terminated his employment as retaliation for his medical leave, in violation of the FMLA. We will begin with Plaintiff's claims of discrimination and then move on to discuss his claim of retaliation.

Before we begin our analysis, however, we feel compelled to note that Plaintiff's brief in opposition has several grammatical and typographical errors, chief of which is a sentence left unfinished on page five. (Doc. 25, p. 5). We also note that many of the facts cited by Plaintiff to support his claims of discriminatory animus point to the allegations within his complaint, rather than record evidence.

As counsel is aware, on a motion for summary judgment we do not accept the facts contained within the complaint as true. Where the brief in opposition does cite evidence in support of his facts, it points to Plaintiff's deposition; the Court therefore reviewed the entirety of Plaintiff's deposition transcript to look for support of his factual claims that were otherwise only supported by his complaint.

### A. Disability Discrimination

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to the ... discharge of employees." 42 U.S.C. § 12112(a). To establish a *prima facie case* of discrimination under the ADA, a plaintiff must show "(1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). For purposes of resolving the Motion, we will assume that Plaintiff's diabetes qualifies as a disability under the ADA and PHRA, that he is qualified for the job, and that his termination was an adverse employment action. Even with those assumptions, however, Plaintiff cannot make out a *prima facie* case of disability discrimination because he cannot establish that Defendant terminated him because of his disability under the third prong. *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 (3d Cir. 2007) ("[T]o

make out a claim under the ADA, the plaintiff need only show that intentional discrimination was the but for cause of the allegedly discriminatory action.").

To satisfy the third prong of his *prima facie* case of disability discrimination, Plaintiff must "establish a causal connection between the adverse employment action and his perceived disability." *Tirk v. Dubrook, Inc.*, 2016 WL 427738, at *3 (W.D. Pa. Feb. 4, 2016), *aff'd*, 673 F. App'x 238 (3d Cir. 2016). Plaintiff points to just two incidents for support that Defendant terminated his employment because of his diabetes: (1) the comment made by Kujovsky in 2014 that Plaintiff should not forget what the company did for him while he was sick; and (2) when his former supervisor, Gleisner, did not do anything to help Plaintiff during a hypoglycemic episode. (Doc. 25, pp. 9-10). The Court fails to discern how these two incidents suggest that his termination on December 20, 2015 was due to his diabetes.

To start, Gleisner did not have any part in the decision to terminate Plaintiff as he was no longer his supervisor. Therefore, to the extent that Gleisner's neglect of Plaintiff during a hypoglycemic episode could illustrate discriminatory animus, it is irrelevant to his subsequent termination. Further, Nicholson testified that he was the decision-maker in terminating the Plaintiff. (Doc. 20, att. 3, pp. 16-17). Noticeably absent is any allegation that Nicholson said or did anything to cause Plaintiff to believe that he harbored discriminatory animus against the Plaintiff;

indeed, Plaintiff testified to the contrary that he could not recall any time where Nicholson made a derogatory remark toward him. (Doc. 20, att. 2, p. 125). Even if we assume that Kujovsky was the decision-maker for Plaintiff's termination, we fail to see how one comment that Plaintiff should remember what they did for him when he was sick at least one year prior is sufficient to illustrate a causal connection between Plaintiff's disability and his termination.

Plaintiff's last effort to establish causation is his testimony that Nicholson changed the reason for his termination during the December 20, 2015 meeting. (Doc. 25, pp. 10-11). Plaintiff testified that Nicholson had originally told Plaintiff that he was being terminated for insubordination for failing to fix his tardiness accountability issues after the December 7, 2015 meeting and that was what was reflected on the personnel document. (Doc. 20, att. 2, pp. 105-107). Plaintiff testified that Nicholson then changed it to reflect that he was being terminated for falsifying records. (*Id.*). Again, we fail to see how this establishes any inference of disability discrimination. Plaintiff has failed to adduce sufficient evidence to establish an inference of a causal connection between his disability and his termination, and has therefore failed to make out a *prima facie* case under the ADA or PHRA. However, for purposes of completeness, we will again make an assumption in favor of Plaintiff and proceed as if he had made out a *prima facie* case of disability discrimination. His claims still fail.

"If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production—but not the burden of persuasion—shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision." *Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 441 (W.D. Pa. 2009) (*citing Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998). Here, the Defendant has offered a non-discriminatory reason for terminating the Plaintiff – the Plaintiff's failure to record the tardiness of his employees, even after receiving clarification on what was expected of him. (Doc. 20, att. 3, pp. 16-17). Where an employer offers a legitimate, non-discriminatory reason for the employment action, the burden sifts back to Plaintiff to show prove pretext by presenting evidence from which a reasonable factfinder could "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108 (3d Cir. 1997) (*citing Fuentes v. Perskie*, 32 F.3d 759, 763(3d Cir. 1994)).

In the present action, Plaintiff has wholly failed to adduce evidence from which a reasonable jury could find that Defendant's reason for termination was pretext for discrimination. We reiterate that the only evidence relied upon by Plaintiff is Kujovsky's comment from at least a year prior, neglect from a previous

14

supervisor that had no role in Plaintiff's termination, and Plaintiff's allegation that Nicholson changed the documentation of Plaintiff's termination from insubordination to falsifying records. This evidence is inadequate as a matter of law to permit any reasonable trier of fact to conclude that Defendant's proffered reason for the termination was pretextual. This is especially true in the face of documentary evidence illustrating Plaintiff's failure to adequately record his employees' tardiness and Plaintiff's admission that he has no reason to dispute the accuracy of the records taken from Kronos. (Doc. 20, att. 3, pp. 23-25). Plaintiff's claims for disability discrimination under Counts I and III cannot survive summary judgment, and we will enter judgment in favor of the Defendant on those claims.

### B. Retaliation

In Count II, Plaintiff claims that Defendant terminated his employment in retaliation for him taking a medical leave of absence. In his brief in opposition, Plaintiff provides *no* additional argument for this claim, instead stating that his FMLA claim is analyzed under the same standard as his ADA and PHRA claim, and that he "was discriminated against based upon his medical condition" for the same reasons. (Doc. 25, p. 12). We follow suit, and for the same reasons discussed, we find that Plaintiff has not adduced sufficient evidence to establish a *prima facie* case of retaliation or to establish that Defendant's legitimate reason for his termination was pretextual for retaliatory motives. The only evidence that would

even plausibly support Plaintiff's claim that he was terminated in retaliation for taking a medical leave is Kujovsky's comment that Plaintiff should remember what they did for him; we cannot hold that this comment, made at least one year prior to Plaintiff's termination, by only one of the people responsible for the employment action, and not derogatory on its face, can support a claim of retaliation. Count II therefore cannot survive summary judgment and we will enter judgment in favor of the Defendant.

IV. **CONCLUSION**

For the foregoing reasons, we shall grant the Defendant's motion for summary judgment in its entirety. A separate order shall issue in accordance with this memorandum.